Richard CARNEY, Appellant,

v.

J. R. SCOTT, Appellee.

Court of Appeals of Kentucky.

June 12, 1959.

Scott. As a result appellant sustained severe personal injuries and his automobile was destroyed. He sued appellee for negligence and sought to recover for his loss of earnings, pain and suffering, permanent impairment of power to work and earn money, medical and hospital expenses, and the destruction of his automobile in the aggregate sum of $119,789.44.

The action was tried before a special judge without a jury. The court found the collision was caused solely by the negligence of appellee and that he was responsible for the injuries and damages suffered by appellant. The court further found that appellant, by his actions and conduct after being injured, materially contributed to his disability by failing to mitigate his injuries and damages, and for this reason awarded him only $9,512.07.

This appeal is from that judgment, and appellant contends the damages awarded are wholly inadequate and the court erred in failing to award him any damages for his permanent disability.

We have always been reluctant to set aside an award for damages, unless the amount is so disproportionate as to strike the mind at first blush as necessarily resulting from passion, prejudice, corruption or mistake in the application of the law. Keller v. Morehead, Ky., 247 S.W.2d 218; Wilkins v. Hopkins, 278 Ky. 280, 128 S.W. 2d 772. The first question in the present case is whether the trial court made a mistake in the application of the law pertaining to mitigation of damages in arriving at its award.

It is the duty of an injured person to exercise ordinary care not to aggravate his injuries and damages. It is unnecessary to determine whether the failure to exercise such care should have been pleaded as an affirmative defense in this action, since there was no objection to the introduction of evidence on the subject, and the mitigation issue was tried by consent of the parties. CR 15.02. However, it is

J. R. Ruark, Morganfield, Franklin & Franklin, Madisonville, for appellant.

Thacker, Sweeney & Lovett, Owensboro, for appellee.

SANDIDGE, Judge.

This action arose out of a head-on collision at night, on Highway No. 130 in Union County, between an automobile owned and operated by appellant, Richard Carney, and one driven by appellee, J. R.

well settled that the wrongdoer always has the burden of proving that some of the consequences of the injuries inflicted by him might have been avoided through proper efforts and the exercise of ordinary care by the injured person. 25 C.J.S. Damages § 144, p. 791. To determine whether appellee satisfied this burden necessitates a résumé of the facts.

At the time of the collision on June 17, 1955, appellant was 26 years old, married and the father of three children. He was an experienced coal miner earning approximately $6,000 per year.

As a result of the collision appellant sustained a compound fracture of his left leg above the knee, several cuts, and other less serious injuries. He was removed to the hospital in Morganfield and became the patient of Dr. Humphrey, who was on the hospital staff. The night of the collision he was given narcotics to relieve his pain and was treated for shock. The next morning his left leg was placed in traction, which involved drilling a hole and inserting a pin through the tibial bone below the left knee and the use of weights to overcome muscle spasm. About a week thereafter infection developed at the site of the compound fracture, at the point where the pin had been inserted through the tibia, and in his heel. The infection was treated with antibiotics. During the early part of appellant's stay in the hospital an insurance company paid his expenses, but the extent of its liability was soon reached, and by July 16th appellant's unpaid hospital bill amounted to $319.20. The following testimony by appellant as to what then occurred is undisputed: "The head nurse, the woman that tends to the bills, came in two or three times wanting some money, so I didn't have it or couldn't raise it, and none of my people has it, they are not rich, so after they come in two or three times, I told them I would go home if it would be all right with the doctor * * * so he came down there with the bill, and after he put the cast on me I signed it, and they

sent me home." It is undisputed that representatives of the hospital, and not appellant, first contacted Dr. Humphrey about his being removed from the hospital. The writing which the doctor had appellant sign after he placed the cast on him and made arrangements for his removal was to the effect that he was leaving the hospital of his own accord.

The answer of Dr. Humphrey to an inquiry from the court as to whether appellant could have stayed in the hospital if he had chosen to do so was as follows: "Well, Judge, hospitals can't operate without money, and I don't believe he would have wanted to stay because the hospital authorities were asking him about the bill every day and the insurance company had notified him that it would not be held obligated, and that caused quite a bit of tension and apprehension and mental strain on Mr. Carney to be in the hospital and know that he didn't have any money to stay there and they were asking for the money, and he would have been very unhappy had he remained there." The printed billhead of the hospital specified in bold type that "All bills are due one week in advance." Apparently appellant was confronted with a Here's-your-hat, what's-your-hurry situation.

The evidence as to what Dr. Humphrey may or may not have said to appellant about leaving the hospital is rather uncertain, indefinite and to some extent conflicting. In answer to an inquiry as to what the appellant was told, the doctor said, "I'm sure I explained to him that we were not through with him and that he needed to stay and receive further treatment." The appellant admitted that he needed to be in the hospital where he could receive better treatment, which is obviously true with respect to almost any ailment, but he could not afford to remain. Dr. Humphrey did not advise him that it would be unsafe for him to go home, or make any predictions as to what might happen if he went home. Instead, he co-operated with appellant leaving the hospital by putting him in a cast

so he could be removed, prescribed further treatment for him, and told him to come back the next month and to continue to come back for treatment. Dr. Humphrey did not release him as a patient. Appellant returned to his home, where he was under the care of a nurse, and continued to take the medicine and treatments prescribed by the doctor. It is undisputed that the "main nurse"·at the hospital told appellant it would be all right for him to go home.

Appellee's theory that the appellant failed to mitigate his injuries and damages is predicated solely on the fact that he acquiesced in being removed from the hospital on July 16th. It is difficult to see how appellant failed to act as a reasonably prudent person under the circumstances.

■ The trial court specifically found as a fact that the appellant "by his failure to heed *the instructions* of his physician and his actions incident to leaving the hospital against *the advice of his doctors*" contributed to his disability and failed to use ordinary care in the mitigation of same. (Our emphasis.) It was expressly and solely on this finding that the court mitigated the damages to which appellant was entitled. There is not a word of evidence that appellant failed in any way to follow the instructions or advice of his doctors. Such finding of fact is not only clearly, but egregiously, erroneous.

■■ Even if it should be assumed appellant failed to exercise ordinary care by leaving the hospital, it must be remembered that damages may be mitigated only in proportion to the aggravation of injuries by the injured person's improper conduct. Billroy's Comedians v. Sweeny, 238 Ky. 277, 37 S.W.2d 43. There is no proof that appellant's injuries were in anyway increased as a result of his leaving the hospital on July 16th. His leg had become infected several weeks before he left. An alignment of the fractured bone had been attained, but there was little callus formation. Dr. Humphrey continued to treat the infection until in September and then released appellant as a patient to Dr. Corum and Dr. Salmon, of Madisonville. Under advice of the latter doctors appellant entered the hospital in Madisonville and remained until April 2, 1956. During all the time he was in the Madisonville hospital he was treated for the infection, which spread to the bone or bones of his leg and he is now suffering from osteomyelitis, a "drop foot" deformity, and a vascular insufficiency in the lower left leg. Because of the infection appellant has lost much of the bone in his left leg, to such an extent that but little, if any, weight can be placed thereon. At the time of the trial it was debatable, from a medical standpoint, whether the leg would have to be amputated. Dr. Humphrey and óther doctors testified that if appellant had remained in traction in the Morganfield hospital until a proper amount of callus formation had developed ·at the compound fracture there would probably have been a better alignment of the bone. They further testified that due to such alignment his left leg is slightly bowed and a little shorter, but Dr. Humphrey stated that there was no change of any importance in the alignment after appellant was placed in the cast. There is no evidence whatsoever to indicate that the infection could have been cured in the Morganfield hospital or that it was aggravated by appellant leaving the hospital. Dr. Humphrey stated that he did not know whether the infection could have been cured if appellant had remained in his hospital. In fact, appellant is making no claim of total or permanent disability in connection with the compound fracture. His sole contention is that the percentage of his total disability stems from the infection. His leaving the hospital in no way affected the infection.

■ Appellant should have been awarded damages commensurate with the degree of his permanent disability or impairment to earn money. Perhaps no award was made for this item on the theory there was no proof as to the extent of such disability.

The court excluded the testimony of Dr. Corum and Dr. Salmon to the effect that appellant had a 75% permanent disability. In so ruling the court erred. Piche v. Halvorson, 199 Minn. 526, 272 N.W. 591; Minnesota Life Ins. Co. v. Vire, 264 Ky. 257, 94 S.W.2d 667; Horn's Adm'r v. Prudential Ins. Co. of America, 252 Ky. 137, 65 S.W.2d 1017. However, this error was to some extent alleviated by the court subsequently asking Dr. Corum if he did not "consider this young man's leg to be totally and permanently disabled except for purposes of temporary movement?", to which the doctor replied that he did. If in addition to that reply the excluded testimony had been admitted, as it should have been, there would have been ample proof that the appellant had at least a 75% permanent disability for which damages should have been awarded.

The complaint was filed on April 1, 1956, to recover for pain and suffering and permanent impairment of appellant's ability to labor and earn money in the sum of $50,000; medical expenses in the sum of $3,780.18; and $1,800 for the destruction of his automobile. An answer in the form of a general denial was filed. On August 10, 1957, appellant filed an amended complaint in which he alleged that immediately prior to the collision he was earning $6,000 per year, and was entitled to recover $13,000 for the loss of time from his work since the collision, and the sum of $500 for each month from the date of such amendment until the trial. The amendment further alleged he was entitled to recover $100,000 for his pain and suffering and the permanent impairment of his ability to labor and earn money, and in addition the sum of $4,989.44 for medical expenses incurred to the date of the amendment. Later appellant filed a second amended complaint in which he alleged he was entitled to recover the additional sum of $300 expended for drugs. No answer was filed to either amendment and the allegations therein were not controverted of record.

But the consequence of the default was removed by the beneficent provisions of CR 15.02. The court adjudged appellant was entitled to recover $600 for damages to his automobile; only $2,412.07 for hospital and medical expenses, although it was undisputed that they amounted to $4,989.44; only $3,000 for loss of time from his work, although the undisputed testimony showed he could have earned $13,000; the sum of $3,500 for pain and suffering; and nothing for the permanent impairment of his ability to work and earn money. The judgment discloses the amounts awarded were based on the erroneous conclusion the damages which appellant had sustained should be mitigated. For that reason the damages awarded are inadequate and inconsistent with the proof.

The provisions of CR 59.01 authorizing a partial new trial are particularly applicable to the facts in this case. The issue as to appellee's liability was definitely, and in our opinion correctly, determined by the trial court, and there was no cross-appeal. The determination of that issue was separate and distinct from the issue concerning the mitigation and amount of damages. The judgment shows on its face there was no compromise in deciding the two issues, i. e., that the damages were limited because of the determination of liability, as is sometimes the case with verdicts. The facts here are quite different from those in Allen v. Large, Ky., 239 S.W.2d 225, and Smith v. Webber, Ky., 282 S.W.2d 346, where it was held that the rulings on the issue of liability and the issue of damages were so "commingled" or dependent one upon the other that there should be a reversal for a trial de novo.

Under the facts in this case the judgment as to appellee's liability should not be disturbed. There should be a new trial on only the issue of damages.

The judgment is accordingly reversed and this action is remanded to the lower court for proceedings consistent herewith.